IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

GIBSON ISLAND CORPORATION,

  Plaintiff,

v.

              Case No. RDB-20-0842

GROUP HOME ON GIBSON ISLAND,
LLC, *et al.*,

  Defendants.

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

## MEMORANDUM OPINION

Plaintiff Gibson Island Corporation (the "Corporation") filed this action against co-Defendants Group Home on Gibson Island ("Group Home") and Craig Lussi ("Lussi") as a result of Defendants' continuing efforts to construct an assisted-living group home for seniors with disabilities at 1753 Banbury Road on Gibson Island (the "Banbury Property"). In this case, the Corporation seeks a declaration that Defendants must halt all construction and submit a proposal for an exception to two restrictive covenants incorporated in the Property's deed. (Corporation's Compl., RDB-20-0842, ECF No. 1 ¶ 49.) Concurrently, in a subsequently filed companion case, Group Home claims that the Corporation has violated the Fair Housing Act, 42 U.S.C. §§ 3601, *et seq.*, by discriminating against it based on the disabilities of its future residents. (Group Home's Compl., RDB-20-0891, ECF No. 1, at 12.)

The Corporation filed a Motion for Summary Judgment in this Declaratory Judgment action, (RDB-20-0842, ECF No. 13), while Group Home filed a competing Motion for Preliminary Injunction in its discrimination case. (RDB-20-0891, ECF No. 2.) These motions were consolidated, and a telephonic hearing was held on May 28, 2020. (RDB-20-0842, ECF

Nos. 8 and 27.) For the reasons set forth on the record at the hearing, and as supplemented by this opinion, the Corporation's Motion for Summary Judgment has been GRANTED, and this case has been closed. (RDB-20-0842, ECF Nos. 28 and 29.)[1] The parties have been directed to submit further filings in Group Home's discrimination case. (RDB-20-0891.)

## BACKGROUND

In ruling on the Corporation's Motion for Summary Judgment, this Court reviews the facts and all reasonable inferences in the light most favorable to Group Home. *Scott v. Harris*, 550 U.S. 372, 378, 127 S. Ct. 1769 (2007); *see also Hardwick ex rel. Hardwick v. Heyward*, 711 F.3d 426, 433 (4th Cir. 2013).

### I.   Gibson Island and the Deed Covenants

Gibson Island is a small island community in Anne Arundel County, located near the junction of the Magothy River and the Chesapeake Bay. (Statement of Material Facts ("SOF"), RDB-20-0842, ECF No. 13-2 ¶¶ 1-2.) The island is about three miles long and two miles wide and contains over 200 residential lots. (*Id.* ¶ 3.) The Gibson Island Corporation holds title to all land on the Island other than private residences and manages the community as a homeowner's association. (Group Home's Compl., RDB-20-0891, ECF No. 1 ¶¶ 13, 3.) The Corporation maintains the island's undeveloped areas, oversees a private security force, and controls access to the island through a small bridge and gatehouse. (*Id.*) Gibson Island property owners are shareholders of the Corporation, and have a right of access to the island, its roadways, and its public facilities. (*Id.* ¶ 13.)

---

[1] Group Home's Motion for a Preliminary Injunction was denied for the reasons set forth on the record at the May 28, 2020 hearing. (RDB-20-0842, ECF No. 27). Many of the arguments introduced for that motion are coextensive with the merits of the summary judgment action discussed in this opinion.

Every lot on Gibson Island is encumbered by a set of restrictive covenants (the "Deed Covenants") that have run with the land since it was developed in the early twentieth century. (SOF ¶ 3.) The Banbury Property has been encumbered since it was conveyed to private ownership by the Corporation in 1925. (Deed and Agreement, RDB-20-0842, ECF No. 13-3, at 2–3.)

Two covenants are relevant to this case: First, Subdivision VII (the "exterior alterations covenant") requires the Corporation's approval before the construction of any "building, fence, wall, drainage or sewerage system or other structure on [the] tract," or "any addition to or change or alteration therein." (Id. at 8.) The Corporation has delegated the oversight of this process to an Architectural Review Committee, which enforces compliance with the Deed Covenants, and studies all proposed renovations to recommend a course of action to the Corporation. (Jost Decl., RDB-20-0842, ECF No. 14-3 ¶¶ 6–8, 28.) According to Chairman Peter H. Jost, the Architectural Review Committee has reviewed 689 proposed renovations since 1995, and approved about eighty-seven percent of submissions. (Id. ¶¶ 2, 17–21.)

Second, Subdivision III (the "business purpose covenant") requires that island properties be "used for private residential purposes only," and provides that "buildings may [only] be erected, maintained or used for business purposes in such locations as may be approved by the Company." (Deed and Agreement, RDB-20-0842, ECF No. 13-3, at 5–6.) The deed also lists specific prohibited businesses but does not include group homes or provide criteria for defining a business use. (Id.)[2] According to James P. Daly, Jr., President of the

---

[2] These businesses include "schools, churches, libraries, art galleries, museums, hotels, apartment-houses, clubs, public garages, community stables, banks, offices and studios." (Id. at 6). Subdivision II further proscribes "noxious, dangerous or offensive" professions—such as slaughterhouses, hospitals, asylums, hogpens, cesspools, and jails. (Id. at 4–5).

3

Gibson Island Corporation, "the Corporation has not authorized any private homeowner to erect, use or maintain their home as a business." (Daly Aff., RDB-20-0842, ECF No. 14-1 ¶ 8.) However, at least forty-eight properties on Gibson Island are owned by LLCs and trusts. (Real Prop. Dat. Search, RDB-20-0842, ECF No. 21-17.) Additionally, the Corporation has allowed residents to rent their homes to non-family, employ household staff, host catered events, work from home, and receive medical or hospice care in their homes. (Corporation's Resp. to Req. for Admis., RDB-20-0842, ECF No. 21-3, at 6.)

## II.   Craig Lussi's Previous Efforts to Establish a Group Home

Craig Lussi is a resident of Gibson Island. (Lussi Aff., RDB-20-0842, ECF No. 21-4 ¶ 2.) Since 2000, Lussi has purchased and held properties on the island in the name of at least three business entities, including two single-member LLCs. (*Id.* ¶ 3.) Through these business organizations, Lussi has leased out properties "for rental timeframes from a few days to over a year," frequently turning a profit on his proceeds. (*Id.* ¶¶ 6–7, Ex. A.) According to Lussi, the Corporation "has never inquired as to [his] plans for the properties" or their impact on the surrounding community. (*Id.* ¶ 4.)

On August 20, 2016, Lussi contacted Jeffrey Kanne—one of the Corporation's board members—about purchasing two properties on Magothy Road to construct a 32-bed assisted living group home. (*Id.* Ex. E.) Kanne forwarded this proposal to the board for consideration. (*Id.*) The board ultimately declined Lussi's offer, and Kanne explained the Corporation had "no interest in the assisted living concept." (*Id.*) Lussi again attempted to purchase one of the two Magothy lots in 2019. (*Id.* ¶¶ 18–21, Ex. G.) The Corporation emphasized that it harbored no concerns with Lussi's proposed use, but nonetheless rejected Lussi's offer, citing

4

Lussi's "history of inappropriate confrontational behavior," and "aggressive, bad faith conduct," providing several emails in which Lussi had threatened the Corporation and its members with litigation. (*Id.* Ex. K.)

### III. Group Home's Acquisition and Financing of the Banbury Property

The Banbury Property has been used as a private residence since the 1970s and was substantially renovated and remodeled in 2005 and 2007. (Group Home's Compl., RDB-20-0891, ECF No. 1 ¶ 16.) On November 22, 2019, property owner Joseph Hennessy Jr. applied to the Anne Arundel County Department of Inspections and Permits for a permit to convert the dwelling into an assisted living facility for seniors with disabilities. (Hennessy Permit Application, RDB-20-0842, ECF No. 13-11.) His application requested permission for various renovations necessary to achieve ADA-compliance. (*Id.*)

In December 2019, Lussi held talks with Anne Arundel County about Hennessy's pending permit and expressed his intention to build a group home at the Banbury Property. (Riggs Email, RDB-20-0842, ECF No. 13-8.) He created two for-profit LLCs for this purpose: (1) Group Home on Gibson Island, to finance and purchase the Property; and (2) Assisted Living Well Compassionate Care 2, to manage the group home's daily affairs. (Articles of Organization, RDB-20-0842, ECF Nos. 13-5 and 13-9.) Through these arrangements, Group Home plans to provide "a place where [disabled seniors] may reside for an unlimited period of time in a supportive, family-like environment." (Mot. for Prelim. Inj., RDB-20-0891, ECF No. 2, at 11.) The facility will charge residents for housing, will require state licensure, will hire and maintain staff, and will receive deliveries of catered meals. (SOF, RDB-20-0842, ECF No. 13-2 ¶¶ 17-22.) Assisted Living has already begun to advertise online. (*Id.* ¶ 16.)

Hennessy's permit was issued by Anne Arundel County on January 16, 2020. (RDB-20-0842, ECF No. 13-6.) On March 4, Group Home bought the Banbury Property from Hennessy for $6,000,000.00. (RDB-20-0891, ECF No. 2-2, Ex. A.) To finance this purchase, the company obtained a loan from the Commercial Banking Department of Sandy Spring Bank. (Supp. Statement of Facts, RDB-20-0842, ECF No. 22-2 ¶ 26.) The loan documents describe the Banbury Property as a "business property", and Group Home executed a promissory note with the Bank, warranting "that all of the proceeds of the loan . . . will be used to acquire or carry on a business or commercial enterprise." (*Id.* ¶¶ 26, 29.) Mr. Lussi also provided an appraiser with a budget calculating projected income from rental revenue, and estimated expenses including "salaries, food, advertising, website maintenance, entertainment, consultants, and uniforms." (*Id.* ¶ 32.)

## IV. Construction and Confrontations

On March 4, Group Home began work on the Banbury Property without submitting a proposal to the Architectural Review Committee. (Group Home's Compl., RDB-20-0891, ECF No. 1 ¶ 22.) The Corporation observed the ongoing construction on March 25, 2020. (Corporation's Compl., RDB-20-0842, ECF No. 1 ¶ 27.) That same day, attorney Craig D. Roswell informed Lussi that he was in violation of the Deed Covenants and demanded that Group Home halt its construction activities. (Group Home's Compl. ¶ 23.) This was followed by a letter from James P. Daly, President of the Gibson Island Corporation, who reiterated that Lussi was in violation of the Covenants and encouraged Lussi to submit a proposal for his group home. (Daly Letter, RDB-20-0842, ECF No. 13-13.) Daly instructed Lussi to include information on the home's projected impacts, such as the number of residents and

employees, the expected daily traffic, and his anticipated need for emergency services. (*Id.*) Lussi has not responded to either communication. (Corporation's Compl. ¶ 35.)

On March 26, a Gibson Island security officer directed Group Home's contractors to leave the island. (Lussi Aff., RDB-20-0891, ECF No. 2-2 ¶ 17B.) Over the next few days, the Corporation denied gatehouse access to Lussi's contractors, so Lussi elected to drive them to the Property in his personal vehicle. (*Id.* ¶ 17C.) On March 31, Lussi was stopped at the gate, and informed that he could not enter the Island with contractors in his car. (*Id.* ¶ 17F.) As a result, he began ferrying his contractors to the Banbury Property by boat. (*Id.*) Although construction has been delayed, Group Home has continued its exterior work, including the removal of solar panels, demolition of retaining walls, expansion of the parking lot, and installation of generator equipment. (SOF, RDB-20-0842, ECF No. 13-2 ¶¶ 24–25.)

## V.   Procedural History

On March 31, 2020, the Gibson Island Corporation filed the subject one-count Complaint for Declaratory Judgment. (RDB-20-0842, ECF No. 1 ¶ 49.) The Corporation requests a declaration that Group Home and Lussi must:

> a. petition the Corporation for an exception to the Deed Covenants
>
> b. detail their plans for an assisted living facility at 1753 Banbury Road so that the Corporation may understand and fairly consider the accommodation they want the Corporation to make; and
>
> c. refrain from unilaterally proceeding with their plans in violation of the Deed Covenants

(*Id.*) On April 3, Group Home filed a complaint under a separate case header, requesting a preliminary injunction against the Corporation's interference with its construction efforts.

(RDB-20-0891, ECF No. 1, at 12.) This was followed by a Motion for a Preliminary Injunction, filed the same day. (RDB-20-0891, ECF No. 2.)

On April 16, 2020, these cases were consolidated, and a telephonic hearing on both motions was scheduled for May 28. (RDB-20-0842, ECF No. 8.) On May 1, Gibson Island Corporation submitted the pending Motion for Summary Judgment, (RDB-20-0842, ECF No. 13), and its Opposition to Group Home's Motion for a Preliminary Injunction. (RDB-20-0842, ECF No. 14.) On May 13, Group Home submitted a consolidated Response to the Summary Judgment Motion and Reply in Support of its Motion for Preliminary Injunction. (RDB-20-0842, ECF No. 21.) The Corporation submitted its Reply to this pleading on May 18. (RDB-20-0842, ECF No. 22.)

## STANDARD OF REVIEW

Rule 56 of the Federal Rules of Civil Procedure provides that a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A material fact is one that "might affect the outcome of the suit under the governing law." *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. When considering a motion for summary judgment, a judge's function is limited to determining whether sufficient evidence exists on a claimed factual dispute to warrant submission of the matter to a jury for resolution at trial. *Id.* at 249. Trial courts in the Fourth Circuit have an "affirmative obligation . . . to prevent factually unsupported claims and

8

defenses from proceeding to trial." *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 526 (4th Cir. 2003) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778–79 (4th Cir. 1993)).

In undertaking this inquiry, this Court must consider the facts and all reasonable inferences in the light most favorable to the nonmoving party. *Libertarian Party of Va.*, 718 F.3d at 312; *see also Scott v. Harris*, 550 U.S. 372, 378 (2007). This Court "must not weigh evidence or make credibility determinations." *Foster v. University of Md.-Eastern Shore*, 787 F.3d 243, 248 (4th Cir. 2015) (citing *Mercantile Peninsula Bank v. French*, 499 F.3d 345, 352 (4th Cir. 2007)). Indeed, it is the function of the fact-finder to resolve factual disputes, including issues of witness credibility. *See Tolan v. Cotton*, 134 S. Ct. 1861, 1866-68 (2014).

## ANALYSIS

The Summary Judgment Motion in this Declaratory Judgment Action turns on two issues: (I) whether the Deed Covenants, in their plain terms, apply to Group Home's proposed use of the Banbury Property; and (II) whether enforcement of the Covenants constitutes disability discrimination in violation of the Fair Housing Act, 42 U.S.C. §§ 3601, *et seq.*

### I. Facial Applicability of the Deed Covenants

The Corporation argues that Defendants have violated the Deed Covenants by unilaterally proceeding with construction and attempting to open an assisted-living group home without seeking the Corporation's approval. "'Under Maryland law, the interpretation of a contract, including the determination of whether a contract is ambiguous, is a question of law.'" *Wa. Metro. Area Transit Auth. v. Potomac Inv. Props., Inc.*, 476 F.3d 231, 234 (4th Cir. 2007) (citation omitted). "Maryland courts apply the objective theory of contract interpretation in which an unambiguous contract must be given the effect of its plain meaning in the context

in which it was employed . . . ." *County Com'rs of Charles Cty. v. Panda-Brandywine*, 663 F. Supp. 2d 424, 428 (D. Md. 2009). "'If a court properly determines that the contract is unambiguous on the dispositive issue, it may then properly interpret the contract as a matter of law and grant summary judgment . . . .'" *Goodman v. Resolution Tr. Corp.*, 7 F.3d 1123, 1126 (4th Cir. 1993) (quoting *World-Wide Rights Ltd. P'ship v. Combe Inc.*, 955 F.2d 242, 245 (4th Cir. 1992)).

The exterior alterations covenant unambiguously applies. This covenant requires Group Home to seek the Corporation's approval before any "change or alteration" to the Banbury Property. (Deed and Agreement, RDB-20-0842, ECF No. 13-3, at 8.) That language contemplates all of Group Home's exterior renovations, from the installation of new generators and HVAC systems, to the removal of retaining walls and solar panels, to the demolition of the patio, the expansion of the parking lot, and the construction of handicap-accessible ramps.[3] The business purpose covenant prohibits Group Home from "erect[ing], maintain[ing], or us[ing]" any building for "business purposes" without an exception from the Corporation. Its applicability turns on whether the for-profit group home Defendants are constructing constitutes a "business purpose" as a matter of law.[4]

As an initial matter, the phrase "business purpose" is unambiguous and may be given the effect of its plain meaning. *See Panda-Brandywine*, 663 F. Supp. 2d at 428; *accord Bretheren*

---

[3] In its briefs, Group Home attempts to limit this conclusion by arguing that the exterior alterations covenant "focus[es] principally on *additions* to existing external conditions, and not on their removal." (RDB-20-0842, ECF No. 21, at 21.) This interpretation is not supported by the covenant's plain language: the removal of a retaining wall is unequivocally a "change or alteration" to the Property.

[4] Group Home attempts to recharacterize the dispute over whether its facility is a "business" as a genuine dispute of material fact that precludes summary judgment. (RDB-20-0842, ECF No. 21, at 30–31.) This argument fails, as contract interpretation is a legal issue. *Potomac Inv. Props., Inc.*, 476 F.3d at 234. The parties do not dispute the material facts that define what Group Home intends to create on the Banbury Property—only the legal significance of those facts and the applicability of the Deed Covenants. (RDB-20-0842, ECF No. 22, at 6–7.)

*Mut. Ins. Co. v. Buckley*, 437 Md. 332, 341 (2014) ("If the language of a contract is plain and unambiguous, we presume that the parties meant what they expressed."). A "business" is commonly understood to be a "commercial . . . activity engaged in as a means of livelihood," and the word "purpose" refers to "[a]n object or end to be attained." Merriam–Webster Collegiate Dictionary (11th ed. 2003); *accord Terrien v. Zwit*, 467 Mich. 56, 64 (Mich. 2002) ("'Business' is defined in legal parlance as an '[a]ctivity or enterprise for gain, benefit, advantage, or livelihood'" (quoting Black's Law Dictionary (6th ed))). Therefore, in its plain terms, the business purpose covenant applies to buildings constructed, maintained, or used to further a commercial enterprise or activity.

Established Maryland and Fourth Circuit authority indicates that this definition includes Defendants' group home.[5] The Court of Appeals of Maryland has affirmed, at least indirectly, that a covenant requiring approval before "the conduct of a profession or home industry" can be applied to a for-profit assisted living facility for seniors with disabilities. *Colandrea v. Wilde Lake Cmty. Ass'n, Inc.*, 361 Md. 371, 378, 393 (2000) (granting issue preclusive effect to circuit court case reaching this conclusion and perceiving "no error in its findings"). This Court has similarly found that a for-profit group home is a "commercial enterprise" that may be subject to a zoning regulation requiring special approval for nonresidential uses in a residential zone. *Bryant Woods Inn, Inc. v. Howard Cty*, 911 F. Supp. 918, 922–23, 944 (D. Md. 1996), *aff'd*, 124 F.3d 597 (4th Cir. 1997). In both cases, the housing authority considered the

---

[5] Other jurisdictions are split on this issue. *Compare Terrien v. Zwit*, 467 Mich. 56, 63, 65 (Mich. 2002) ("[T]he operation of a 'family day care home' violates covenants prohibiting both nonresidential uses and commercial, industrial, or business uses" as the owners "are providing a service to the public in which they are making a profit."), *with Rhodes v. Palmetto Pathway Homes*, 303 S.C. 308, 485–86 (1991) ("[T]he incident necessities of operating a group home such as . . . managing, supervising, and providing care for individuals in exchange for monetary compensation . . . do not . . . change the character of a residence from private to commercial.").

11

impact of the proposed group home on the surrounding area to evaluate its compatibility with a residential community. *Colandrea*, 361 Md. at 378–79; *Bryant Woods*, 911 F. Supp. at 943–44.

In light of the above authority, it is clear as a matter of law that Defendants are starting a business on the Banbury Property. The uncontested facts demonstrate that Group Home seeks to earn a profit, and that its facility will feature all the usual incidents of a commercial enterprise—it will employ full-time staff, receive catered deliveries, maintain business records, obtain state licensure, and advertise its services. (SOF, RDB-20-0842, ECF No. 13-2 ¶¶ 17–22.) In addition, Defendants consistently referred to their group home as a "business" throughout their loan transactions with Sandy Spring Bank and warranted that their loan proceeds "will be used to acquire or carry on a business or commercial enterprise." (Supp. Statement of Facts, RDB-20-0842, ECF No. 22-2 ¶¶ 26–29.) This conduct falls within the plain meaning and scope of the business purpose covenant—the language and effect of which approximates the covenant considered in *Colandrea* and the regulation at issue in *Bryant Woods*.

It is irrelevant that Group Home's customers will live in a residential setting. Although "zoning ordinance[s] [are] concerned with the use of property, and not with ownership," *People's Counsel for Balt. Cty. v. Surina*, 400 Md. 662, 701 (2007) (citation omitted), the Deed Covenants expressly bind and obligate the "Purchaser" of the Banbury Property. (Deed and Agreement, RDB-20-0842, ECF No. 13-3, at 2–3.)[6] This is consistent with longstanding Maryland authority: In *Keseling v. City of Baltimore*, 220 Md. 263 (1959), the Court of Appeals of Maryland held that a zoning ordinance "prohibit[ing] business uses" could be applied to a

---

[6] Group Home also insists that Anne Arundel County authorizes the construction of group homes in any residential zone. *See* Anne Arundel Cty. Code § 18-4-106. Nevertheless, restrictive covenants may be "more restrictive than the zoning classification imposed by the external zoning authority . . . because the covenants exist as independent controls on property." *City of Bowie v. Mie Props., Inc.*, 398 Md. 657, 695 (2007).

residential property that was subdivided into eleven separate units and rented out for profit. 220 Md. at 268–70. As the property owners occupied only one of eleven dwelling units, the Court of Appeals held that "[t]he principal use of the building" was "as a place for the carrying on of the business of renting apartments and rooms," despite the residential use of each unit. *Id.* at 270.

The same reasoning applies here: Although the residents of Defendants' group home will live in a residential setting, Group Home's principal use of the property is as a place for carrying on the business of providing for seniors with disabilities. Accordingly, the business purpose covenant is facially applicable, and Group Home must seek an exception from the Corporation before proceeding with its construction.

## II. Fair Housing Act Discrimination Claim

Group Home asserts that the Corporation's enforcement of the Deed Covenants, irrespective of their facial applicability, is discriminatory in violation of the Fair Housing Act ("FHA" or "Act"). Under the Act, it is "unlawful for any person or other entity whose business includes engaging in residential real estate-related transactions to discriminate against any person in making available such a transaction, or in the terms or conditions of such a transaction, because of race, color, religion, sex, handicap, familial status, or national origin." 42 U.S.C. § 3605(a). As Group Home would bear the burden of proof on this claim at trial, it must "go beyond the pleadings" and affirmatively establish a genuine dispute of material fact to avoid summary judgment on these grounds. *Celotex Corp.*, 477 U.S. at 324.

Discrimination claims under the Fair Housing Act require evidence of a discriminatory intent or a discriminatory impact. *Robinson v. Bd. of Cty. Comm'rs for Queen Anne's Cty.*, No.

RDB-07-1903, 2008 WL 2484936, at *9 (D. Md. June 19, 2008). To establish a discriminatory motive, a litigant may offer direct proof of discrimination, defined as "'conduct or statements that both (1) reflect directly the alleged discriminatory attitude, and (2) bear directly on the contested [housing] decision.'" *Letke v. Wells Fargo Home Mortg., Inc.*, No. RDB-12-3799, 2013 WL 6207836, at *3 (D. Md. Nov. 27, 2013) (quoting *Laing v. Fed. Express Corp.*, 703 F.3d 713, 717 (4th Cir. 2013)). Alternatively, a litigant may offer circumstantial evidence through the *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), burden-shifting framework:

> [P]laintiffs must show that the discriminatory animus was a motivating factor, but they do not have to show that it was the primary or dominant purpose. . . . Once the plaintiff shows that the action was based, at least in part, on discriminatory animus, the burden shifts to defendants to show a legitimate nondiscriminatory reason for their actions . . . . If defendants are able to make a prima facie showing of a legitimate, nondiscriminatory reason, the burden returns to plaintiff to demonstrate that the reason was a pretext.

*Id.* (citations omitted).

Group Home presents two theories of discrimination. First, Group Home argues that the Corporation's application of the Deed Covenants is motivated by discriminatory animus. (RDB-20-0842, ECF No. 21-1, at 17.) The FHA forbids discrimination "in the sale or rental . . . [of] a dwelling . . . because of a handicap of . . . any person associated with that buyer or renter." 42 U.S.C. § 3604(f)(1)(C). Accordingly, facially neutral covenants cannot be discriminatorily enforced to prevent the establishment of assisted-living group homes for disabled individuals. *Skipper v. Hambleton Meadows Arch. Review Comm.*, 996 F. Supp. 478, 484–85 (D. Md. 1998) (collecting cases). Group Home insists that the Corporation's rejection of Lussi's offer to buy the Magothy properties in 2016—and Jeffrey Kanne's explanation that the Corporation has "no interest in the assisted living concept"—"demonstrates that [the

Corporation] affirmatively does not want an assisted living group home for seniors with disabilities on Gibson Island." (RDB-20-0842, ECF No. 21, at 18). Defendants further insist that the Corporation's "shifting rationale" in its rejection of Lussi's 2019 offer provides additional evidence of discrimination. (*Id.*); *see Pathways Psychosocial v. Town of Leonardtown*, 133 F. Supp. 2d 772, 786 (D. Md. 2001).

However, four years have passed, and this case features a separate transaction involving a different parcel, a different proposal, and different decisionmakers. Although Kanne's comments may "'reflect directly the alleged discriminatory attitude,'" they are too attenuated to "'bear directly on the contested [housing] decision'" in this case and cannot support an intentional discrimination claim absent additional evidence. *See Letke*, 2013 WL 6207836, at *3 (citation omitted). The Corporation's rejection of Lussi's 2019 proposal does not suffice: The Corporation declined this offer on nondiscriminatory grounds, and Lussi offers no evidence that this rationale was pretextual. *See McDonnell Douglas*, 411 U.S. at 802–805.

Second, Group Home insists that the Corporation's request for impact information is disparate treatment and circumstantial evidence of discrimination. (RDB-20-0891, ECF No. 2-1, at 15; RDB-20-0842, ECF No. 21, at 31.) "[T]he inquiry under a disparate treatment analysis is whether similarly situated persons or groups are subject to differential treatment." *Potomac Grp Home Corp.*, 823 F. Supp. at 1295; *Montgomery Cty. v. Bank of Am. Corp.*, 421 F. Supp. 3d 170, 181 (D. Md. 2019); *see also Huntington Branch, N.A.A.C.P. v. Town of Huntington*, 844 F.2d 926, 933 (2d Cir.), *aff'd*, 488 U.S. 15 (1988). Group Home argues that other Gibson Island homeowners routinely rent out their residence for a profit, employ household staff, hold catered events, and receive deliveries or medical care in their homes—without requesting the

15

Corporation's approval under the Deed Covenants or providing projected impact information. (RDB-20-0842, ECF No. 21, at 31.) This contention misses the point, as the Deed Covenants are facially applicable to Group Home's activities. Group Home offers no evidence that other homeowners have been allowed to establish a comparable facility on their property without first applying for an exception.

Importantly, the process for requesting an exception under the Deed Covenants is consistent with the Fair Housing Act's reasonable accommodation provision. The Act defines discrimination to include "a refusal to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling." 42 U.S.C. § 3604(f)(3)(B). Nevertheless, "the FHA does not provide a 'blanket waiver of all facially neutral zoning policies and rules, regardless of the facts.'" *Bryant Woods Inn, Inc. v. Howard Cty*, 124 F.3d 597, 603 (4th Cir. 1997) (quoting *Oxford House v. City of Va. Beach*, 825 F. Supp. 1251, 1261 (E.D. Va. 1993)). "Where a local land use or zoning code contains specific procedures for seeking a departure from the general rule, courts have decided that these procedures should ordinarily be followed" when requesting an accommodation. *State and Local Land Use Laws and Practices and the Application of the Fair Housing Act*, Joint Statement of the Dep't of HUD and the DOJ 16 (Nov. 10, 2016), www.justice.gov/opa/file/912366/download. Accordingly, litigants must give local land use authorities an opportunity to grant an accommodation before bringing a discrimination claim on these grounds. *E.g., Tsombanidis v. W. Haven Fire Dep't*, 352 F.3d 565, 578 (2d Cir. 2003); *Astralis Condo. Ass'n v. Sec'y, U.S. Dep't of HUD*, 620 F.3d 62, 67 (1st Cir. 2010).

The information requested by the Corporation is an important part of this process. As the Fourth Circuit held in *Bryant Woods*, an accommodation request must be granted if it is "(1) reasonable and (2) necessary . . . to afford handicapped persons equal opportunity to use and enjoy housing." 124 F.3d at 603. To determine whether an accommodation is reasonable, courts consider "the benefits that the accommodation would provide to the handicapped" and "the extent to which the accommodation would undermine the legitimate purposes and effects of existing zoning regulations." *Id.* at 603; *see also City of Va. Beach*, 825 F. Supp. at 1261 ("[T]he need for such balancing is evident" as communities "have important interests in regulating traffic, population density and services to ensure the safety and comfort of all citizens, including those who are handicapped."). A requested accommodation must not impose "'undue financial and administrative burdens,'" or require "'fundamental alterations in the nature of the program.'" *Bryant Woods*, 124 F.3d at 604 (quoting *Se. Cmty. College v. Davis*, 442 U.S. 397, 412 (1979); *Alexander v. Choate*, 469 U.S. 287, 301 n.20 (1985)).

As there is no assisted living center on Gibson Island, Defendants' group home may be "necessary" to provide equal opportunity for disabled seniors. The information requested by the Corporation—from the group home's effect on traffic to its projected need for emergency services—is essential to determine whether an accommodation is also reasonable. These impacts are consistent with the information that has traditionally been considered by homeowner's associations and zoning boards when evaluating FHA accommodation requests. *E.g., Bryant Woods*, 124 F.3d at 604 (comparing traffic and parking impacts to local demand); *Colandrea*, 361 Md. at 378–83 (considering "trash, noise, parking, traffic, sewage, and health");

17

*Lapid-Laurel, LLC v. Zoning Bd. of Adjustment of Twp. Of Scotch Plains*, 284 F.3d 442, 446 (3d Cir. 2002) (observing "problems with traffic safety and emergency vehicle access").

Under this framework, Defendants' discrimination claim is simply unripe at this stage of these proceedings. The Deed Covenants do not prohibit the establishment of an assisted-living group home for disabled seniors—they simply require providers to request a reasonable accommodation through the established review procedures. Instead of following these procedures and granting the Corporation an opportunity to provide an exception to its facially neutral rules, Group Home seeks to bypass these rules entirely and unilaterally proceed with its construction. The Fair Housing Act simply does not simply provide Group Home and Lussi a "blanket waiver" of facially neutral rules. *Bryant* Woods, 124 F.3d at 603. Until an accommodation has been requested and denied—and absent any evidence that the Covenants have been applied to Defendants with a discriminatory motive—Group Home has failed to present a genuine issue of material fact suggesting that the Corporation has violated the Fair Housing Act.

## CONCLUSION

For the reasons stated above, and set forth on the record, Plaintiff's Motion for Summary Judgment (RDB-20-0842, ECF No. 13) was GRANTED at the May 28, 2020 hearing. (RDB-20-0842, ECF Nos. 28 and 29). The requested Declaratory Judgment was issued, and the parties were directed to submit subsequent findings under Case No. RDB-20-0891.

Dated: June 5, 2020

*[signature]*

Richard D. Bennett
United States District Judge